**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
JAVIER RAMOS,

                      Plaintiff,

          - against -

NEW YORK CITY HEALTH + HOSPITALS
CORPORATION and WILLIAM OLMEDA,
*Individually,*

                    Defendants.

-----------------------------------------------------------------X

                **COMPLAINT**

                **PLAINTIFF DEMANDS**
                **A TRIAL BY JURY**

      Plaintiff, JAVIER RAMOS, by his attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complains of Defendants, upon information and belief, as follows:

## NATURE OF THE CASE

1.      Plaintiff complains pursuant to the <u>Americans with Disabilities Act of 1990</u>, 42 U.S.C. § 12101, *et seq*. ("ADA") and the <u>New York City Human Rights Law</u>, New York City Administrative Code § 8-107(1), *et seq.,* ("NYCHRL") and seeks damages to redress the injuries he has suffered due to the Defendants 1) refusing to accommodate Plaintiff's disability (diabetes), 2) forcing him to retire due to the repeated denials of his request for a reasonable accommodation and 3) subjecting Plaintiff to retaliation for complaining about Defendants' failure to accommodate his disability.

## JURISDICTION AND VENUE

2.      Jurisdiction of this Court is proper under 42 U.S.C. § 12101 *et seq.,* and 28 U.S.C. §§ 1331 and 1343.

3.      The Court has supplemental jurisdiction over the claims of Plaintiff brought under the NYCHRL pursuant to 28 U.S.C. § 1367.

4.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as the actions giving rise to this matter occurred within the Eastern District of New York.

**PROCEDURAL PREREQUISITES**

5.    Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC").

6.    Plaintiff received a Notice of Right to Sue from the EEOC, dated January 18, 2018, with respect to the herein charges of discrimination.  A copy of the Notice is annexed hereto.

7.    This Action is being commenced within 90 days of receipt of said Notice.

**PARTIES**

8.    Plaintiff JAVIER RAMOS (hereinafter "RAMOS") is a resident of the State of New York, Richmond County.

9.    Defendant NEW YORK CITY HEALTH + HOSPITALS CORPORATION (hereinafter "HHC") is a domestic, not-for-profit corporation, operating under the laws of the State of New York.

10.    At all times material, Defendant HHC owned and/or operated approximately eleven hospitals, as well as other clinics, and rehabilitation and long-term care facilities.

11.    Queens Hospital Center ("Queens Hospital") is a public hospital, owned, controlled and operated by Defendant HHC, located at 82-68 164th Street, Jamaica, New York 11432.

12.    At all times material, Plaintiff RAMOS was an employee of Defendant HHC, working at Queens Hospital, wherein the majority of the discriminatory and retaliatory conduct against Plaintiff took place.

13.    At all times material, Defendant WILLIAM OLMEDA (hereinafter "OLMEDA") was an

employee of Defendant HHC, holding the position of "Director of Hospital Police."

14.    At all times material, Defendant OLMEDA was Plaintiff RAMOS' supervisor and/or held supervisory authority over Plaintiff.  Defendant OLMEDA had the authority to hire, terminate and/or affect the terms and conditions of Plaintiff's employment.

15.    Defendants HHC and OLMEDA and are jointly referred to herein as the "Defendants."

## MATERIAL FACTS

16.    Plaintiff RAMOS commenced his employment with Defendant HHC as a "Special Officer" in or around 1989.

17.    Plaintiff RAMOS was promoted to "Detective," then "Sergeant" (otherwise known as "Supervising Special Officer Level 1") on or about May 8, 2000.  Plaintiff RAMOS' income for 2016 was approximately $77,535.

18.    From May 2000 to February 2001, Plaintiff RAMOS was assigned to the 4:00 p.m. to 12:00 a.m. shift, known as Tour 3.  From February 2001 to January 2003, Plaintiff RAMOS was assigned to the 12:00 a.m. to 8:00 a.m. shift, known as Tour 1, due to the retirement of a supervising special officer.

19.    Then, around January 2003, Plaintiff RAMOS was assigned back to Tour 3.

20.    On September 29, 2014, Plaintiff RAMOS was hospitalized and diagnosed with diabetes. That day, upon being discharged from the hospital, Plaintiff RAMOS called Captain Joseph Perry, his supervisor, and informed him of his diagnosis.  Upon returning to work on October 4, 2014, Plaintiff RAMOS met with Defendant OLMEDA and Captain Perry.  During the meeting, Plaintiff RAMOS informed Defendant OLMEDA that he was diagnosed with diabetes and showed Defendant OLMEDA and Captain Perry his medical records, which stated that Plaintiff RAMOS was diagnosed with diabetes.

21.     Subsequently, in or around November 2014, Captain Perry informed Plaintiff RAMOS that his co-worker, Lieutenant George Feliciano, who worked as a supervisor on the 8:00 a.m. to 4:00 p.m. shift, known as Tour 2 or the day tour (hereinafter "the day tour") was retiring, and encouraged Plaintiff RAMOS to apply for Lieutenant Feliciano's position once he retired.

22.     In or around December 2014, after Lieutenant Feliciano retired, Plaintiff RAMOS informed Captain Perry that he was very interested in applying for the supervisor's position on the day tour.  Plaintiff RAMOS requested a reasonable accommodation of his diabetes by way of transfer to the day tour, by explaining to Captain Perry that working in the day tour would improve his health, as he would be able to exercise, eat better, sleep better, and monitor his sugar levels.  Captain Perry responded that Plaintiff RAMOS should direct his request to Defendant OLMEDA.  Immediately thereafter, Plaintiff RAMOS and Captain Perry went to Defendant OLMEDA's office where Plaintiff RAMOS asked Defendant OLMEDA for a reasonable accommodation of his diabetes by way of a transfer to the day tour.  Plaintiff RAMOS also explained to Defendant OLMEDA that such an accommodation would permit him to exercise, eat better, sleep better, and properly monitor his sugar levels.  Defendant OLMEDA responded that he had to conduct interviews but was sure that he would give Plaintiff RAMOS the position.  Defendant OLMEDA then added that he would not be able to move Plaintiff RAMOS to the day shift immediately but would be able to have an update for Plaintiff RAMOS sometime in January of 2015.

23.     Plaintiff RAMOS followed up with Defendant OLMEDA in January 2015 in order to get a time frame for his move to the day tour.  At that time, Defendant OLMEDA responded that he would conduct interviews after the promotion of Plaintiff RAMOS' co-worker, Detective Bernard Mondezie.  Upon information and belief, Defendant OLMEDA wanted Detective

Mondezie to work on the day tour, to train new employees on workplace violence, a task that should have been performed by Defendant OLMEDA.

24. Plaintiff RAMOS requested an accommodation of his disability by way of a transfer to the day tour by asking Defendant OLMEDA again for the transfer in or around February 2015. Defendant OLMEDA informed Plaintiff RAMOS that he would conduct the interviews in a couple of weeks. However, he added that, Detective Mondezie, who would be promoted to sergeant, was also interested in the day tour supervisor position. Plaintiff RAMOS emphasized that he was interested in day tour because it would accommodate his diabetes by allowing him the time he needed to exercise, take his medication, and monitor his blood sugar. Plaintiff RAMOS explained to Defendant OLMEDA, that since he often worked several hours alone in his scheduled shift, Tour 3, he would be forced to delay eating and taking his medication in a timely manner, due to the calls he would get for assistance and have to address on his own. By way of explanation, Lieutenant Robert Davis, the employee with whom Plaintiff worked on Tour 3, often did not arrive for his shift on time. As such, Plaintiff RAMOS was forced to work five to six hours alone on many nights. If Plaintiff RAMOS was moved to the day tour, there would be two supervisors and one captain on that shift who would be able to cover Plaintiff while he tended to his diabetes needs.

25. Plaintiff RAMOS further explained to Defendant OLMEDA that the fact that he got home passed 2:30 a.m., due to his long commute from Queens to Staten Island, which lasted an average of an hour and a half, was also affecting his health. Plaintiff RAMOS reiterated that he was "only looking to improve [his] health and that moving [him] would not cost anything except modifying the schedules as [Defendant OLMEDA] had done previously with Officer Jason Prieto and Officer Tyree Gullat." By way of background, upon information and belief,

Officers Prieto and Gullat had requested to be moved to certain shifts and their requests were granted.  As Plaintiff finished making his plea, Defendant OLMEDA's phone rang and he stated that he had to take the call and would talk to Plaintiff RAMOS at a later time.  However, Defendant OLMEDA left work that day without speaking to Plaintiff RAMOS again.

26.    In or around March 2015, Defendant OLMEDA summoned Plaintiff RAMOS to his office and conveyed to him that he would conduct the interviews for the day tour supervisor position the ensuing Tuesday and asked Plaintiff RAMOS to get to work a little early for the interview. That Tuesday, Defendant OLMEDA interviewed Plaintiff RAMOS and ended by stating, "Sergeant Ramos, you have the position.  I would like for you to come in for the day tour, maybe at about 11:00 a.m. to 7:00 p.m., but I need to speak to Captain Perry first so that he knows."  Defendant OLMEDA added, "I want to make sure he [Captain Perry] is ok with you coming in a bit later, just like Lieutenant Davis does."  Defendant OLMEDA then promised to get back to Plaintiff RAMOS.  Plaintiff RAMOS explained to Defendant OLMEDA that the 11:00 a.m. to 7:00 p.m. schedule would not permit Plaintiff RAMOS to exercise, since most gyms were closed after 7:00 p.m. and riding a bike at night to exercise would be dangerous.  Plaintiff RAMOS further explained that a transfer to the 8:00 a.m. to 4:00 p.m. shift, the day tour, would properly accommodate him.  Plaintiff RAMOS continued by saying that he could even start his shift a little earlier and leave a little later, if Defendant OLMEDA needed him.  Defendant OLMEDA responded that he would see what he could do.

27.    Then, on April 10, 2015, Plaintiff RAMOS spoke to Defendant OLMEDA again to inquire about the move to the day shift.  Defendant OLMEDA responded that he would transfer Plaintiff RAMOS once Sergeant Mondezie was moved to another tour.  A few days later, on

April 16, 2015, Defendant OLMEDA informed Plaintiff RAMOS that Sergeant Mondezie would be trained on the day tour for about a month and Plaintiff RAMOS would be moved to the day tour after Sergeant Mondezie completed his training.

28.    On April 22, 2015, Defendant OLMEDA spoke to Plaintiff RAMOS again and stated that he would like to see Plaintiff RAMOS and Sergeant Mondezie working together on the day tour but asked Plaintiff RAMOS to wait another month for his co-worker, Detective Takina Jones, to take Plaintiff RAMOS' place in his tour after being promoted to sergeant.

29.    Then, on April 28, 2015, Plaintiff RAMOS asked for a reasonable accommodating again by inquiring about the transfer.  At that time, Defendant OLMEDA responded that he would not be able to transfer Plaintiff RAMOS until after June of 2015 when he would get approval of Detective Jones' promotion to sergeant by Defendant HHC.  Plaintiff RAMOS reiterated that he needed the transfer due to his disability.  Defendant OLMEDA replied that he would move Plaintiff RAMOS but he needed some time.

30.    On May 1, 2015, Plaintiff RAMOS asked Defendant OLMEDA again for a reasonable accommodation by way of a transfer to the day tour.  Defendant OLMEDA stated that he was awaiting the approval of the promotion of Detective Jones.  Plaintiff RAMOS explained to Defendant OLMEDA that he had discussed his need for a transfer with Sergeant Justin Allbright and Sergeant Mondezie and both were willing to change their tours from the day tour to Tour 3 and 1, respectively, in order for Plaintiff RAMOS to be accommodated to the day tour.  However, Defendant OLMEDA responded that Plaintiff RAMOS had to wait and that he could not accommodate him at that time.

31.    Plaintiff RAMOS followed-up with Defendant OLMEDA again on May 1, May 7, May 9 and May 20, 2015 regarding the tour change but his requests for a reasonable accommodation

of his disability were inexplicably not approved.

32.    On June 2, 2015, Plaintiff RAMOS advised Captain Perry of the ongoing issues with his blood sugar levels, which were consistently rising, and asked him to speak to Defendant OLMEDA on his behalf regarding his transfer to the day tour.

33.    On June 14, June 15, and July 7, 2015, Plaintiff RAMOS asked Defendant OLMEDA again for a reasonable accommodation of his disability by way of transfer to the day tour. Defendant OLMEDA responded that he was still awaiting the promotion of Detective Jones.

34.    On August 5, 2015, Plaintiff RAMOS pleaded with Defendant OLMEDA for an accommodation of his disability, after attending a medical appointment where Plaintiff RAMOS' physician, Dr. Shahed A. Quyyumi, informed Plaintiff RAMOS that his blood sugar was high again. Dr. Quyyumi expressed to Plaintiff RAMOS that his job and commute appeared stressful and if Plaintiff RAMOS changed his schedule, his blood sugar would normalize. Dr. Quyymi also pointed Plaintiff RAMOS to articles discussing positive correlations between working nights shifts and diabetes. Even though Plaintiff RAMOS conveyed to Defendant OLMEDA that his blood sugar levels were high due to his work hours and, once again requested a reasonable accommodation of a transfer to the day tour, Defendant OLMEDA stubbornly replied, "You need to work with me and give me more time."

35.    On August 18, 2015, Plaintiff RAMOS spoke with Defendant OLMEDA again regarding the tour change. Defendant OLMEDA, appearing upset and annoyed, assured Plaintiff RAMOS that he would be moved once Detective Jones was promoted. Exhausted from chasing Defendant OLMEDA for a reasonable accommodation of his disability to no avail, Plaintiff RAMOS asked Captain Perry for help. Captain Perry assured Plaintiff RAMOS

that he would speak with Defendant OLMEDA on Plaintiff RAMOS' behalf.  Plaintiff RAMOS then spoke with Randy Klein, Director of Law Enforcement for Plaintiff RAMOS' union, Local 237, regarding the tour change, explaining that he needed to be transferred to the day tour due to his diabetes.  Mr. Klein promised Plaintiff RAMOS that he would visit Defendant OLMEDA at Queens Hospital to speak to him regarding Plaintiff RAMOS' tour change.  However, Mr. Klein did not get back to the Plaintiff RAMOS regarding his promise.

36.   On September 1, 2015, not having received any updates regarding the tour change, Plaintiff RAMOS e-mailed Defendant OLMEDA inquiring about his transfer from Tour 3 to the day tour.  Defendant OLMEDA replied that a meeting would be scheduled.  During that meeting, which took place sometime in September, Defendant OLMEDA said to Plaintiff RAMOS that he would get back to him about his request for a transfer after conferring with Captain Perry.  However, Defendant OLMEDA did not keep his promise.

37.   Then, on or about November 23, 2015, Defendant OLMEDA sent Plaintiff RAMOS an e-mail regarding his tour change request, stating that Plaintiff RAMOS would get a start date. However, the next day, on November 24, 2015, Defendant OLMEDA sent out an e-mail stating that all requests for tour changes were being placed on hold until after the holidays. At that point, Plaintiff RAMOS asked to speak with Defendant OLMEDA in his office. Once in Defendant OLMEDA's office, Plaintiff RAMOS asked him, "Why haven't you moved me? My blood sugar is continuously rising, I need the tour change. I can't understand why you would keep me waiting this long."  Enraged, Defendant OLMEDA replied, "Sergeant Ramos, you are making me very angry.  I want you to understand that I will move you when I can."  Plaintiff RAMOS then asked Defendant OLMEDA to give

him a valid reason for not being moved, considering that he always did what he was asked to do, his evaluations were satisfactory, and Detective Jones, who had less seniority than Plaintiff RAMOS, was promoted to the day tour. Defendant OLMEDA responded irately, "I don't have to give you a reason. HHC gives me authority to make decisions. I'll move you when I can." Then, Defendant OLMEDA claimed he had to take a call as his phone rang, and promised to call Plaintiff RAMOS back in his office. However, Defendant OLMEDA did not speak to Plaintiff RAMOS again on that day.

38.   Plaintiff RAMOS felt extremely frustrated, particularly considering the fact that he had repeatedly asked for a reasonable accommodation of his disability for over a year, while his co-worker, Officer Johnathan Perez, who had requested a tour change for other reasons, was granted the transfer less than two months after requesting it.

39.   On January 3, 2016, Plaintiff RAMOS noticed that Sergeant Mondezie was assigned to Tour 1, while Sergeant Jones, Sergeant Richard Gravino, and Captain Perry were assigned to the day tour. However, Plaintiff RAMOS had not received any updates regarding his request for a reasonable accommodation.

40.   **Subsequently, on January 20, 2016, Plaintiff RAMOS e-mailed Defendant OLMEDA requesting a meeting for the tour change. Upon receiving Plaintiff RAMOS's e-mail, Defendant OLMEDA called Plaintiff RAMOS into his office and told Plaintiff RAMOS that he did not have to accommodate Plaintiff RAMOS's disability and that Plaintiff RAMOS was beginning to "piss [him] off."** Disappointed, Plaintiff RAMOS asked Defendant OLMEDA why he was upset, adding that Plaintiff RAMOS did not have a choice in being disabled and all he asked for was a tour change from his shift in which he had worked many years without complaining. Plaintiff RAMOS added that Sergeant

Jones, who had less seniority than Plaintiff RAMOS, was promoted to the day tour. Further, Plaintiff RAMOS stated that he did not understand how, Defendant HHC, a health care facility, refused to accommodate its own disabled employee.  Defendant OLMEDA became furious and replied, "HHC gives me the authority to make decisions in these matters."

41.     From February 2016 until April 2016, Plaintiff RAMOS did not receive any updates regarding his request for a reasonable accommodation.  Then, in or around May 2016, Plaintiff RAMOS spoke with Sergeant Agostini, another employee of Defendant HHC, who worked in the same position as Plaintiff RAMOS at Coney Island Hospital, regarding swapping positions.  The swap would be beneficial to both Plaintiff RAMOS and Sergeant Agostini since Sergeant Agostini lived in Queens and worked in Coney Island, whereas Plaintiff RAMOS lived in Staten Island and worked in Queens.  Sergeant Agostini spoke to his supervisor, Hilda Valentin, Director of Hospital Police at Coney Island Hospital, who agreed to interview Plaintiff RAMOS for the position at Coney Island Hospital.

42.     On June 15, 2016, Plaintiff RAMOS spoke to Mrs. Valentin who set up an interview with Plaintiff RAMOS for June 30, 2016.  Mrs. Valentin interviewed Plaintiff RAMOS on June 30, as scheduled, and agreed to allow Plaintiff RAMOS to work at Coney Island Hospital, contingent upon Sergeant Agostini being accepted at Queens Hospital.

43.     Upon reporting for work on June 30, 2016, Plaintiff RAMOS informed Captain Perry that he had been interviewed at Coney Island Hospital for the same position in which he worked at Queens Hospital and was accepted there.  Subsequently, Plaintiff RAMOS approached Defendant OLMEDA, informed him of the potential swap with Sergeant Agostini, and asked him if it was possible to be transferred to Coney Island Hospital since he could not

be accommodated at Queens Hospital.  Defendant OLMEDA replied, "If that is what you need and what you want, no problem."  Plaintiff RAMOS then gave Defendant OLMEDA Sergeant Agostini's number but Defendant OLMEDA instructed Plaintiff RAMOS to direct Sergeant Agostini to call Defendant OLMEDA.  Sergeant Agostini called Defendant OLMEDA numerous times and was able to finally get a hold of him after several weeks of unanswered calls.  Sergeant Agostini explained to Defendant OLMEDA who he was and talked to him regarding the transfer to which Defendant OLMEDA replied that he did not have any openings at that time but would call Sergeant Agostini if a position became available.  Subsequently, Sergeant Agostini called Plaintiff RAMOS and informed him of his conversation with Defendant OLMEDA.  Plaintiff RAMOS also asked Defendant OLMEDA about his conversation with Sergeant Agostini.  Defendant OLMEDA simply replied that he would speak with Captain Perry about the matter.

44.    Then, in or around July 2016, Plaintiff RAMOS asked Defendant OLMEDA again for an accommodation of his disability by way of the transfer to the day tour.  Defendant OLMEDA replied, "I need you to wait Sergeant Ramos."  Thereafter, Plaintiff RAMOS approached Mr. Klein again for help, asking him whether he could speak to Defendant OLMEDA on his behalf or facilitate Plaintiff RAMOS' transfer to Coney Island Hospital. Mr. Klein responded that he would work something out.

45.    Subsequently, Plaintiff RAMOS requested a meeting with Defendant OLMEDA and Captain Perry to address the repeated denials of his request for an accommodation of his disability.  Defendant OLMEDA once again responded that Plaintiff RAMOS must wait. When Plaintiff RAMOS asked why, Defendant OLMEDA responded, "Because I can do as I see fit."

46.     In July 2016, Plaintiff RAMOS and his co-worker, Officer Carlos Morales, whom Plaintiff RAMOS supervised, spoke with David Baksh, Director of Support Service, on several occasions, regarding an issue that Officer Morales was facing.  During those conversations, Plaintiff RAMOS complained to Mr. Baksh regarding Defendant OLMEDA' s failure to accommodate his requests for a shift change due to his diabetes, explaining that the shift change would help him cope with his diabetes and aid him in controlling his sugar levels. Plaintiff RAMOS informed Mr. Baksh that his blood sugar levels were consistently high and that, as a result, his doctor had changed his medication numerous times.  Plaintiff RAMOS asked Mr. Baksh to help him with his requests for an accommodation or suggest a way to resolve the issue.  Plaintiff RAMOS also asked Mr. Baksh if he knew anyone who could help him transfer to Coney Island Hospital, since Plaintiff RAMOS knew a sergeant (referring to Sergeant Agostini) who was willing to swap positions. Mr. Baksh replied that he knew someone at Coney Island Hospital but he would rather try to solve the problem at Queens Hospital, than see Plaintiff RAMOS be transferred to Coney Island Hospital. Mr. Baksh also said that he would speak to his supervisor, Dean Mihaltes, to schedule a meeting with Plaintiff RAMOS.

47.     Subsequently, as Mr. Baksh and Mr. Mihaltes were leaving work one day, they saw Plaintiff RAMOS and asked to speak with him. During their conversation, for which Officer Morales was also present, Plaintiff RAMOS complained to Mr. Mihaltes regarding the fact that Defendant OLMEDA had ignored his requests for a reasonable accommodation of his diabetes by way of a shift change.  Plaintiff RAMOS also explained to Mr. Mihaltes that since Defendant OLMEDA denied his requests for a reasonable accommodation of being transferred to a different shift, he asked to swap positions with

Sergeant Agostini of Coney Island Hospital but that Defendant OLMEDA also ignored his request for a transfer.  Mr. Mihaltes promised Plaintiff RAMOS that he would call him and Officer Morales to his office to discuss their respective issues.

48.     Sometime thereafter, Mr. Mihaltes called Plaintiff RAMOS and Officer Morales into his office for a meeting, as promised. At that meeting, where Mr. Baksh was also present, Plaintiff RAMOS complained again about Defendant OLMEDA's failure to accommodate his diabetes. Mr. Mihaltes promised he would look into the matter.

49.     Following Plaintiff RAMOS' meeting with Mr. Baksh and Mr. Mihaltes, Defendant OLMEDA asked Plaintiff RAMOS to report to his office.  Upon his arrival, Plaintiff RAMOS met with Defendant OLMEDA and Defendant OLMEDA's supervisor, Michael Valentino.  Mr. Valentino asked Plaintiff RAMOS if there was a problem, as he was advised that Plaintiff RAMOS had asked for a tour change, which had not been granted. Plaintiff RAMOS responded that he had asked for a reasonable accommodation of his diabetes, which was ignored.  Mr. Valentino dismissed Plaintiff RAMOS without addressing his complaint.  Plaintiff RAMOS believes that Mr. Valentino was supporting Defendant OLMEDA because Mr. Valentino and Defendant OLMEDA have been friends for over 20 years.

50.     Subsequently, Defendant OLMEDA and Captain Perry began to treat Plaintiff with hostility.  By way of example, Defendant OLMEDA would say to Plaintiff RAMOS mockingly, approximately two or three times per week, "You got to take care of your blood sugar!"  Furthermore, Defendant OLMEDA began to ostracize Plaintiff RAMOS by ignoring his presence and avoiding contact with Plaintiff RAMOS.  Captain Perry became confrontational and condescending in the way he communicated with Plaintiff RAMOS.

Plaintiff RAMOS believes that Defendant OLMEDA and Captain Perry began treating Plaintiff RAMOS in a hostile manner, in retaliation for his complaints regarding Defendant OLMEDA's failure to accommodate his disability, in order to force him to retire.

51. Then, in or around August 2016, Plaintiff RAMOS spoke to the new Director of Coney Island Hospital, Angel Vasquez, to assess whether Sergeant Agostini and Plaintiff RAMOS could swap positions. Mr. Vasquez advised Plaintiff RAMOS that he would speak to Defendant OLMEDA directly. In or around September 2016, Mr. Vasquez informed Plaintiff RAMOS that he called Defendant OLMEDA and left messages but Defendant OLMEDA did not return his calls.

52. On October 26, 2016, Plaintiff RAMOS reached out to Mr. Klein once more regarding his potential transfer to Coney Island Hospital. A couple of days later, Mr. Klein informed Plaintiff RAMOS that the management at Queens Hospital did not want Sergeant Agostini due to his support for the Hospital Police Benevolent Association, which management at Queens Hospital opposed. Plaintiff RAMOS believes that Mr. Klein was referring to Defendant OLMEDA and Captain Perry when referring to management.

53. Plaintiff RAMOS asked Defendant OLMEDA again to transfer him to the day tour, as a reasonable accommodation of his disability, in or around November 2016, but Defendant OLMEDA ignored Plaintiff RAMOS's request.

54. In or around December 2016, Mr. Mihaltes informed Plaintiff RAMOS that he was still looking into his problem, referring to Plaintiff RAMOS' requests for a reasonable accommodation, and that he did not want Plaintiff RAMOS to transfer to another hospital or retire.

55. On January 30, 2017, Plaintiff RAMOS asked Captain Perry for a reasonable

accommodation of his disability by stating that his move to the day tour would improve his health.  At that time, Sergeant Gravino, who worked on the day tour had taken leave under the Family Leave Act.  As such, Plaintiff asked Captain Perry to replace Sergeant Gravino on the day tour, while he was on leave.  Captain Perry, however, replied that the only person who could make that decision was Defendant OLMEDA and that Plaintiff RAMOS needed to speak to Defendant OLMEDA.  However, Plaintiff RAMOS was not able to get in contact with Defendant OLMEDA, who was avoiding him.

56.   Plaintiff RAMOS approached Defendant OLMEDA again in February and March, 2017, asking for a reasonable accommodation of his disability by way of a tour change or transfer to Coney Island Hospital.  Plaintiff specifically pointed to the fact that Sergeant Gravino's position on the day tour was vacant and asked to be placed on the day tour.  Each time Defendant OLMEDA promised Plaintiff RAMOS that he would get back to him but did not keep his promises.  Sergeant Gravino's position remained vacant for the duration of Plaintiff's employment with Defendants.

57.   On April 21, 2017, Defendant OLMEDA called Plaintiff RAMOS into his office and, in the presence of Captain Perry, in retaliation for Plaintiff RAMOS' complaints regarding Defendant's failure to accommodate his disability, informed Plaintiff RAMOS that his overtime hours at Bellevue Hospital were being eliminated.  By way of background, Plaintiff RAMOS worked 22.5 hours biweekly at Bellevue Hospital, another HHC hospital, to cover their staffing shortage.  Upon information and belief, Queens Hospital was reimbursed for Plaintiff RAMOS' compensation by Bellevue Hospital.  Defendant OLMEDA stated that Plaintiff RAMOS' hours were eliminated due to a request by Chief Operating Officer, Christopher Rokers, related to budgetary problems.  However, Captain

Sharon Rodriguez, the overtime coordinator at Bellevue Hospital informed Plaintiff RAMOS that overtime hours were never discontinued at Bellevue Hospital.

58.   Immediately after his meeting with Defendant OLMEDA and Captain Perry, Plaintiff RAMOS spoke to Ms. Pascal, an employee of Defendant's Human Resources Department, regarding the fact that he had made numerous requests for a reasonable accommodation of being transferred to the day tour, which were denied.  Plaintiff RAMOS then asked Ms. Pascal if he could speak to someone regarding a swap to Coney Island Hospital.  Ms. Pascal responded, "You need to speak to your director" explaining that his director was the person who could address his requests.  Since Plaintiff RAMOS' director was Defendant OLMEDA, the person who denied his numerous requests for a reasonable accommodation, Plaintiff RAMOS felt hopeless and decided to speak to Mr. Rokers directly.

59.   Later that day, Plaintiff RAMOS called Mr. Rokers' office to seek help regarding his requests for an accommodation of his disability.  Mr. Rokers' secretary called Plaintiff RAMOS on or about April 24, 2017, asking Plaintiff RAMOS to call her back to make an appointment with Mr. Rokers.  However, after thinking about the repeated denials of his requests for a reasonable accommodation, the failure by Mr. Baksh, Mr. Mihaltes and Mr. Klein to assist him in his requests for a reasonable accommodation, the retaliation he faced by Defendant OLMEDA and Captain Perry after complaining to Mr. Baksh and Mr. Mihaltes regarding the denials of his reasonable accommodation requests, and the elimination of his overtime hours at Bellevue Hospital, Plaintiff RAMOS feared further retaliation and decided to take his complaint of disability discrimination outside of HHC.

60.   Thereafter, Plaintiff RAMOS noticed that Captain Perry and Defendant OLMEDA granted Sergeant Mondezie all the overtime he requested.  At that point, Plaintiff RAMOS realized

that he could no longer work for Defendant HHC.

61.   As such, on May 31, 2017, Plaintiff RAMOS was constructively discharged by being forced to retire from his employment of 28 years with Defendant HHC.

62.   Defendant HHC failed to engage in the ADA's required interactive process to reasonably accommodate Plaintiff RAMOS' disability and denied Plaintiff RAMOS' numerous requests for a reasonable accommodation.

63.   Plaintiff RAMOS' diabetes constitutes an impairment that substantially limits one or more of his major life activities within the meaning of § 12102(1)(A) of the ADA.  Plaintiff RAMOS's disability substantially limits, *inter alia*, his walking, standing, movement of his hands, seeing, and sleeping.

64.   Plaintiff RAMOS is a qualified individual who can perform the essential functions of his employment with or without a reasonable accommodation as defined by § 12111(8) of the ADA.

65.   But for Defendants' failure to accommodate Plaintiff RAMOS' disability, Plaintiff RAMOS would not have been constructively discharged by being forced to leave his 28-year employment with Defendant HHC due to his deteriorating health.

66.   Plaintiff RAMOS has been unlawfully discriminated against, humiliated, and degraded, and as a result, suffers loss of rights and emotional distress.

67.   Plaintiff RAMOS has been subjected to retaliation for complaining of Defendants' refusal to accommodate his disability.

68.   Defendants' actions and conduct were intentional and intended to harm Plaintiff RAMOS.

69.   As a result of the acts and conduct complained of herein, Plaintiff RAMOS has suffered the loss of income, the loss of a salary, bonuses, benefits and other compensation which

such employment entails, exacerbation of his diabetes, emotional distress, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

70.     Due to the disability discrimination and retaliation, Plaintiff RAMOS suffered significant physical and emotional distress and economic loss.

71.     Defendants' conduct has been malicious, willful, outrageous, reckless and conducted with full knowledge of the law.   As such, Plaintiff demands punitive damages against the Defendants.

**FIRST CAUSE OF ACTION FOR DISCRIMINATION**
**UNDER THE AMERICANS WITH DISABILITIES ACT**

72.     Plaintiff RAMOS repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

73.     Plaintiff claims Defendant HHC violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

74.     Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112, Discrimination [Section 102] states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

75.     Defendant HHC engaged in an unlawful discriminatory practice against Plaintiff because of his disability, by failing to engage in an interactive process, failing to provide Plaintiff with a reasonable accommodation, and forcing Plaintiff to retire due to the repeated denials of his request for a reasonable accommodation.

76.     As such, Plaintiff RAMOS has been damaged as set forth herein.

## SECOND CAUSE OF ACTION FOR RETALIATION
## UNDER THE AMERICANS WITH DISABILITIES ACT

77.     Plaintiff RAMOS repeats and realleges each and every paragraph above as if said

paragraph was more fully set forth herein at length.

78.     The ADA prohibits retaliation, interference, coercion, or intimidation.

79.     42 U.S.C. § 12203 provides:

    i.  Retaliation. No person shall discriminate against any individual because such individual
has opposed any act or practice made unlawful by this chapter or because such individual
made a charge, testified, assisted, or participated in any manner in an investigation,
proceeding, or hearing under this chapter.

    ii. Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten,
or interfere with any individual in the exercise or enjoyment of, or on account of his or
her having exercised or enjoyed, or on account of his or her having aided or encouraged
any other individual in the exercise or enjoyment of, any right granted or protected by
this chapter.

80.     Defendant HHC violated this section as set forth herein.

## THIRD CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

81.     Plaintiff RAMOS repeats and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

82.     The Administrative Code of City of New York § 8-107(1) provides that "It shall be an

unlawful discriminatory practice: (a) For an employer or an employee or agent thereof,

because of the actual or perceived age, race, creed, color, national origin, gender, disability,

marital status, sexual orientation or alienage or citizenship status of any person, to refuse

to hire or employ or to bar or to discharge from employment such person or to discriminate

against such person in compensation or in terms, conditions or privileges of employment."

83.     Defendants violated the section cited herein.

## FOURTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

84.     Plaintiff RAMOS repeats and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

85.     The Administrative Code of City of New York § 8-107(15)(a) provides that, "[A]ny person

prohibited by the provisions of this section from discriminating on the basis of disability

shall make reasonable accommodation to enable a person with a disability to satisfy the

essential requisites of a job or enjoy the right or rights in question provided that the

disability is known or should have been known by the covered entity."

86.     Defendants violated the section cited herein.

## FIFTH CAUSE OF ACTION FOR RETALIATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

87.     Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were

more fully set forth herein at length.

88.     The New York City Administrative Code § 8-107(7) provides that it shall be unlawful

discriminatory practice: "For an employer . . . to discriminate against any person because

such person has opposed any practices forbidden under this chapter. . ."

89.     Defendant HHC engaged in an unlawful discriminatory practice in violation of New York

City Administrative Code § 8-107(7) by discriminating against Plaintiff because he

complained of Defendants' failure to accommodate his disability.

## SIXTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

90.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this Complaint as if more fully set forth herein at length.

91.     The New York City Administrative Code §8-107(6) provides that it shall be an unlawful

discriminatory practice: "For any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

92.    Defendant OLMEDA engaged in unlawful discriminatory practices in violation of New York City Administrative Code §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory and unlawful conduct.

## SEVENTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

88.    Plaintiff RAMOS repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

89.    The New York City Administrative Code § 8-107(13) "Employer liability for discriminatory conduct by employee, agent or independent contractor" provides:

a.    An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

b.    An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

1. the employee or agent exercised managerial or supervisory responsibility; or

2. the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

3. the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

c.  An employer shall be liable for an unlawful discriminatory practice committed   by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

90.  Defendant HHC violated the section cited herein.

**<u>JURY DEMAND</u>**

91.  Plaintiff RAMOS requests a jury trial.

**WHEREFORE**, Plaintiff RAMOS respectfully requests a judgment against the Defendants, individually, jointly, and severally:

A.  Declaring that Defendants engaged in unlawful employment practices prohibited by the Americans with Disabilities Act, and the New York City Administrative Code, § 8-107 *et seq*., in that Defendants refused to accommodate Plaintiff's disability and forced Plaintiff to retire due to the repeated denials of his request for a reasonable accommodation and subjected Plaintiff to retaliation for complaining about Defendants' refusal to accommodate his disability;

B.  Awarding damages to Plaintiff RAMOS for all lost wages and benefits resulting from Defendants' unlawful discrimination and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

C.  Awarding Plaintiff RAMOS compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to his reputation;

D.  Awarding Plaintiff RAMOS punitive damages;

E.  Awarding Plaintiff RAMOS attorneys' fees, costs, disbursements, and expenses incurred

in the prosecution of this action;

F.    Awarding Plaintiff RAMOS such other and further relief as the Court may deem equitable,

just and proper to remedy the Defendants' unlawful employment practices.

Dated: New York, New York
       February 6, 2018

PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC

By:    _____

**Dorina Cela, Esq.**
**Joshua P. Frank, Esq.**
*Attorneys for Plaintiff*
45 Broadway, Suite 620
New York, New York 10006
(212) 248-7431
dcela@tpglaws.com
jfrank@tpglaws.com

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | **Javier RAMOS**<br>**471 Falcon Avenue**<br>**Staten Island, NY 10306** | From: | **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |

| ☐ | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **16F-2017-00288** | **Holly M. Shabazz,**<br>**State & Local Program Manager** | **(212) 336-3643** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

**Kevin J. Berry,**
**District Director**

January 18, 2018
*(Date Mailed)*

Enclosures(s)

cc:   **Blanche Greenfield**

| **Attn: Director of Human Resources**<br>**NEW YORK CITY HEALTH AND HOSPITALS CORP**<br>**55 Water Street**<br>**New York, NY 10038** | **Dorina Cela, Esq.**<br>**Phillips & Associates**<br>**45 Broadway, Suite 620**<br>**New York, NY 10006** |

CITY OF NEW YORK
COMMISSION ON HUMAN RIGHTS

RECEIVED
NOV 2 7 2017
CH
BY:

---

In the Matter of the Complaint of:

JAVIER RAMOS,

                              Complainant,

          - against -

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION and WILLIAM OLMEDA,

                              Respondents.

---

Complaint No.: M-E-D-17-23813
Federal Charge No.: 16F-2017-00288C


NOTICE OF ADMINISTRATIVE
CLOSURE

---

Pursuant to Section 8-113(a)(5) of the Administrative Code of the City of New York and Rule 1-22(a)(5) of the Rules of Practice of the City Commission on Human Rights the above-captioned case is hereby dismissed for administrative convenience because Complainant wishes to pursue his claims in court.  This dismissal does not affect the right of aggrieved parties to file a civil action pursuant to Section 8-502 of the Administrative Code of the City of New York.

Pursuant to Section 8-113(f) of the Administrative Code of the City of New York and Rule 1-22(f) of the Rules of Practice a complainant or respondent may apply to the Office of the Chairperson for review of this dismissal.  The request for review must be made in writing within thirty days of service of this order.  A copy of the request must be sent to all parties to the complaint and addressed to the Office of General Counsel, New York City Commission on Human Rights, P.O. Box 2023, New York, NY 10272.  The Office of General Counsel will refer the request to the Office of the Chairperson.

Dated:   New York, NY
         November  16  , 2017

                              _____
                              Hollis Pfitsch
                              Deputy Commissioner
                              Law Enforcement Bureau

TO:

Counsel for Complainant
Dorina Cela, Esq.
Phillips & Associates

45 Broadway, Suite 620
New York, NY 10006

Counsel for Respondents
Blanche Greenfield
Chief Employment Counsel
New York City Health and Hospitals Corporation
Office of Legal Affairs
125 Worth Street, 5th Floor, RM 527
New York, NY 10013



*Law Enforcement Bureau*
22 Reade Street, New York, NY 10007
212-306-7450

The enclosed document(s) contain important information about the status of a case at the NYC Commission on Human Rights. If you need interpretation to understand these document(s), please call 212-416-0133 and request an interpreter. Please also call to notify us of your preferred language so that we can provide interpretation and/or translation through the duration of this case.

**Arabic / عربي**

يحتوي المستند المرفق (المستندات المرفقة) على معلومات مهمة عن وضعية إحدى القضايا لدى لجنة حقوق الإنسان بنيويورك (NYC Commission on Human Rights). إذا كنت بحاجة إلى ترجمة فورية لفهم هذه الوثيقة (الوثائق)، يرجى الاتصال على 212-416-0133 وطلب مترجم فوري. كما نرجو الاتصال بنا لموافاتنا باللغة التي تفضلها حتى يمكننا توفير الترجمة الفورية و/أو الترجمة الكتابية أثناء مدة القضية.

**বাংলা / Bengali**

সংযুক্ত ডকুমেন্ট (গুলোতে) নিউ ইয়র্ক সিটি কমিশন অন হিউম্যান রাইটস (NYC Commission on Human Rights)-এ একটি মামলার স্ট্যাটাস সম্পর্কে গুরুত্বপূর্ণ তথ্য রয়েছে। এই ডকুমেন্ট (গুলো) বুঝতে আপনার দোভাষী প্রয়োজন হলে, অনুগ্রহ করে 212-416-0133 নম্বর কোন বর্ণনা এবং একজন দোভাষীর জন্য অনুরোধ করান। আপনার পছন্দের ভাষা সম্পর্কে অবগতকরণ জানানোর জন্যও কল করান যাতে এই মামলা চলাকালীন সময়ে আমরা আপনাকে দোভাষী পরিষেবা এবং/অথবা অনুবাদ প্রদান করতে পারি।

**Chinese (Cantonese) / 中文（粵語）**

所附文件包含紐約市人權委員會（NYC Commission on Human Rights）一宗案件狀態嘅重要資料。如果你需要通過翻譯先至能睇明文件內容，請撥打 212-416-0133 並要求翻譯。都麻煩打電話告知你所偏好嘅電話，我哋可以喺案件進行過程中提供口譯和/或者翻譯。

**Chinese (Mandarin) / 中文（普通话）**

所附文件内含纽约市人权委员会（NYC Commission on Human Rights）案件状态的重要资料。如果您需要通过翻译才能看懂这些文件，请拨打 212-416-0133 请求口译员的协助。请同时打电话通知我们您偏好使用的语言，以便我们能在本案期间提供口译及/或翻译服务。

**Français / French**

Les documents ci-joints contiennent des informations importantes concernant le statut d'un cas en instance auprès de la Commission des Droits de l'Homme de la ville de New York (NYC Commission on Human Rights). Si vous avez besoin d'une interprétation pour comprendre ces documents, veuillez appeler le 212-416-0133, et demander un interprète. Veuillez aussi nous appeler pour nous faire savoir quelle langue vous préférez utiliser pendant toute la durée de ce cas afin que nous puissions vous fournir les services d'interprétation et/ou de traduction appropriés.

**Kreyòl Ayisyen / Haitian Creole**

Dokiman ou jwenn la a gen enfòmasyon enpòtan sou eta yon dosye nan Komisyon Vil Nouyòk pou Dwa Moun (NYC Commission on Human Rights). Si w bezwen sèvis entèprèt pou konprann dokiman sa(yo), tanpri rele 212-416-0133 epi mande yon entèprèt. Tanpri, rele tou pou fè nou konnen ki lang ou pi pito dekwa pou nou ka bay sèvis entèprèt ak/oswa tradiksyon pandan tout dire dosye sa a.

**한국어 / Korean**

첨부된 문서(들)에는 뉴욕시 인권위원회(NYC Commission on Human Rights)의 케이스 진행 상태에 관한 중요한 정보가 수록되어 있습니다. 이러한 문서(들)을 이해하는 데 한국어 통역/번역이 필요하시면 212-416-0133 번으로 전화하셔서 통역사를 요청하십시오. 또한 전화로 귀하가 원하는 언어를 알려주시면 이 케이스가 진행되는 기간 동안 통역 및/또는 번역 서비스를 제공해 드릴 수 있습니다.

**Русский / Russian**

В прилагаемом(-ых) документе(-ах) содержится важная информация о состоянии дела, рассматриваемого Комиссией по правам человека г. Нью-Йорка (NYC Commission on Human Rights). Если для понимания этого документа (этих документов) вам требуется перевод, позвоните по тел. 212-416-0133 и попросите предоставить вам устного переводчика. Пожалуйста, также позвоните и сообщите предпочтительный для вас язык, чтобы мы могли предоставить вам устный и (или) письменный перевод в период рассмотрения этого дела.

**Español / Spanish**

Los documentos adjuntos contienen información importante sobre el estado de un caso en la Comisión de Derechos Humanos de la ciudad de Nueva York (NYC Commission on Human Rights). Si necesita servicios de interpretación para comprender estos documentos, llame al 212-416-0133 para solicitar un intérprete. Asimismo, llámenos para informarnos cuál es su idioma de preferencia, a fin de que podamos brindar servicios de interpretación o traducción durante el transcurso de su caso.

**Urdu / اردو**

منسلک دستاویز (دستاویزات) نیویارک سٹی کمیشن برائے انسانی حقوق (NYC Commission of Human Rights) میں ایک کیس کی حالت کے بارے میں اہم معلومات پر مشتمل ہیں۔ اگر آپ کو ان دستاویز (دستاویزات) کو سمجھنے کے لیے ترجمے کی ضرورت ہو تو 212-416-0133 پر کال کرکے ایک ترجمان کے لیے درخواست کریں۔ اس کے علاوہ ہمیں اپنی ترجیحی زبان سے مطلع کرنے کی غرض سے بھی کال کریں تاکہ ہم اس کیس کے دوران ترجمان اور / یا ترجمہ فراہم کر سکیں۔

NYC

*Law Enforcement Bureau*
22 Reade Street, New York, NY 10007
212-306-7450

**Shqip / Albanian**

Dokumenti(at) e bashkëngjitur përmbajnë informacion të rëndësishëm në lidhje me statusin e një çështjeje në Komisionin e të Drejtave të Njeriut të Qytetit të New Jorkut (NYC Commission on Human Rights). Në qoftë se keni nevojë për përkthim që t'i kuptoni këto dokument(e), ju lutemi telefononi numrin 212-416-0133 dhe kërkoni përkthyes. Ju lutemi telefononi gjithashtu që të na njoftoni për gjuhën që preferoni me qëllim që t'ju ofrojmë përkthim me gojë dhe/ose me shkrim gjatë gjithë kohëzgjatjes së kësaj çështjeje.

**Ελληνικά / Greek**

Τα εσωκλειόμενα έγγραφα περιέχουν σημαντικές πληροφορίες για μια υπόθεση στην Επιτροπή της Νέας Υόρκης για τα Ανθρώπινα Δικαιώματα. Εάν χρειάζεστε μετάφραση για να καταλάβετε αυτά τα έγγραφα, παρακαλούμε τηλεφωνήστε στον αριθμό 212-416-0133 και ζητήστε διερμηνέα. Τηλεφωνήστε μας επίσης για μας ενημερώσετε για την γλώσσα που προτιμάτε ώστε να σας παρέχουμε διερμηνία η/και μετάφραση κατά την διάρκεια της υπόθεσης.

**עברית / Hebrew**

המסמך(ים) המצורף(ים) פו מבכילים פרטים חשובים בנוגע למצב של מקרה אצל המשרד בניו-יארק של זכיות האדם(NYC Commission on Human Rights). אם אתם 212-416-0133 ולבקש מתורגמן. נא ל'כ להודיע לנו את מבחר השפה שמסעגף לך, כדי שנוכל להעמיד לרשותכם שירות תרגום עין בשעת המשפט הזה.

**हिंदी / Hindi**

संलग्नित दस्तावेज़ में न्यू यॉर्क सिटी आयोग मानव अधिकारों ('NYC Commission on Human Rights') के कामकाज के मामलों की स्थिति के बारे में महत्वपूर्ण जानकारी शामिल हैं। यदि आप इन दस्तावेज़ों को समझने के लिए व्याख्या की जरूरत है, कृपया 212-416-0133 पे कॉल करे और एक दूभाषिया के लिए अनुरोध करे। कृपया हमें अपनी पसंद की भाषा के बारे में सूचित करने के लिए भी कॉल करे ताकि हम इस मामले की अवधि में व्याख्या और/या अनुवाद प्रदान कर सकते हैं।

**Italiano / Italian**

I documenti acclusi contengono dati importanti sullo stato di un caso dibattuto alla Commissione per i diritti umani di New York (NYC Commission on Human Rights). Se vi occorre un interpretariato per comprendere questi documenti, chiamate il numero 212-416-0133 e chiedete un interprete. Chiamateci anche per comunicarci la vostra lingua preferita, in modo che possiamo fornire l'interpretariato e/o la traduzione per tutta la durata di questo caso.

**日本語 / Japanese**

添付・同封の書類にはあなたのニューヨーク市人権委員会 (NYC Commission on Human Rights) におけるケースのステータスに関する重要な情報が含まれています。もしこれらの書類を理解するのに通訳が必要な場合は、212-416-0133 に電話をして、通訳者をリクエストして下さい。同時に、ご希望の言語を知らせて下さい。このケースの期間中、通訳・翻訳が提供されます。

**नेपाली / Nepali**

संलग्न कागजात (हरू) मा न्युयोर्क सिटी मानव अधिकार आयोग (NYC Commission on Human Rights) मा एउटा मुद्दाको अवस्थाबारे महत्वपूर्ण जानकारी समावेश छन्। यदि तपाईंलाई यी कागजात (हरू) बारे बुझ्न व्याख्याको सहायता चाहिन्छ भने कृपया २१२.२१६.०१३३ (212.416.0133) मा फोन गर्नुहोस् र दोभाषेका लागि अनुरोध गर्नुहोस्। तपाईंले बुझ्ने भाषा बुझ्न हो भनेर बानकारी गराउन कृपया हामीलाई फोन गर्नुहोस्, त्यसो गर्नुको भने यी मुद्दा चलुन्जेल हामी तपाईंलाई दोभाषे-सेवा तथा अनुवाद-सेवा उपलब्ध गराउन सक्छौं।

**Polski / Polish**

Załączony/e dokument/y zawiera ważne informacje o statusie postępowania toczącego się przed Komisją Praw Człowieka Miasta Nowy Jork (NYC Commission on Human Rights). Jeżeli dla zrozumienia tych dokumentów potrzebne będzie tłumaczenie, prosimy o telefon na numer 212-416-0133 i zgłoszenie potrzeby tłumacza ustnego. Prosimy także poinformować nas o swoim preferowanym języku, żebyśmy mogli zapewnić odpowiedniego tłumacza ustnego i/lub pisemnego na czas trwania postępowania.

**Português / Portuguese**

O documento (ou documentos) anexo contém informações importantes sobre o status do caso na Comissão de Direitos Humanos da Cidade de Nova York (NYC Commission on Human Rights). Se você precisar de interpretação para entender o(s) documento(s), ligue para 212-416-0133 e solicite um intérprete. Também nos telefone para nos notificar sobre o seu idioma preferido, para que possamos fornecer interpretação e/ou tradução ao longo do presente caso.

**ਪੰਜਾਬੀ / Punjabi**

ਨੱਥੀ ਦਸਤਾਵੇਜ਼ ਨਿਊਯਾਰਕ ਸ਼ਹਿਰ ਦੇ ਮਨੁੱਖੀ ਅਧਿਕਾਰ ਆਯੋਗ (NYC Commission on Human Rights) ਦੇ ਇੱਕ ਕੇਸ ਦੀ ਅਵਸਥਾ / ਸਥਿਤੀ ਬਾਰੇ ਮਹੱਤਵਪੂਰਨ ਜਾਣਕਾਰੀ ਰੱਖਦਾ ਹੈ। ਜੇ ਇਹ ਦਸਤਾਵੇਜ਼ ਨੂੰ ਸਮਝਣ ਲਈ ਤੁਹਾਨੂੰ ਵਿਆਖਿਆ ਦੀ ਲੋੜ ਹੈ, ਤਾਂ 212-416-0133 'ਤੇ ਫ਼ੋਨ ਕਰੋ ਅਤੇ ਇੱਕ ਦੁਭਾਸ਼ੀਏ ਲਈ ਬੇਨਤੀ ਕਰੋ। ਕਿਰਪਾ ਕਰਕੇ ਸਾਨੂੰ ਆਪਣੀ ਤਰਜੀਹੀ ਭਾਸ਼ਾ ਬਾਰੇ ਵੀ ਫ਼ੋਨ ਕਰਕੇ ਸੂਚਿਤ ਕਰੋ ਤਾਂ ਜੋ ਅਸੀਂ ਇਸ ਮਾਮਲੇ ਦੇ ਅੰਤਰਾਲ ਦੌਰਾਨ ਵਿਆਖਿਆ ਅਤੇ / ਜਾਂ ਅਨੁਵਾਦ ਮੁਹੱਈਆ ਕਰਵਾ ਸਕੀਏ।

**Tagalog / Tagalog**

Ang nakapaloob na (mga) dokumento ay naglalaman ng mahalagang impormasyon tungkol sa estado ng isang kaso sa Komisyon Para sa Karapatang Pantao sa NYC (NYC Commission on Human Rights). Kung kailangan ninyo ng interpretasyon upang maunawaan ang (mga) dokumentong ito, mangyaring tumawag sa 212-416-0133 at humiling ng tagapagsalin. Mangyari ding tawagan kami upang masabi sa amin ang gusto ninyong wika upang makapagbigay kami ng interpretasyon at/o pagsasaling-wika sa kabuuan ng kasong ito.

**Українська / Ukrainian**

Доданий документ (документи) містить важливу інформацію щодо статусу справи, що розглядається Комісією Нью-Йорка з прав людини (NYC Commission on Human Rights). Якщо вам потрібен переклад для розуміння змісту документів, зателефонуйте за номером 212-416-0133 та залиште запит на надання послуг перекладача. Будь ласка, також зателефонуйте, щоб повідомити про обрану вами мову, щоб ми мали змогу забезпечувати вас усним та/або письмовим перекладом протягом усього розгляду справи.

**ייִדיש / Yiddish**

דער ביגעלייגטער דאקומענט אנטהאלט וויכטיקע אינפֿארמאציע איבער דעם סטאטוס פֿון א פֿאל ביי דער מענטשנרעכטן קאמיסיע פֿון ניו-יארק (NYC Commission on Human Rights). טאמער דארפֿט איר אן אינטערפּרעטאציע כדי צו פֿארשטייט די דאקומענט(ן) רופֿט אן 212-416-0133 און בעט אן אינטערפּרעטער/איבערזעצער. רופֿט אונדז אויך אן צו לאזן וויסן אייער פֿאר פֿאראויסגעזעצטע שפּראך, מיר זאלן קענען געבן אן אינטערפּרעטאציע און/אדער איבערזעצונג דורכויס דעם פֿאראויסגעזעצטע

Bill de Blasio, Mayor | Carmelyn P. Malalis, Commissioner/Chair | NYC.gov/HumanRights | @NYCCHR